[Crim. No. 29601. Second Dist., Div. Five. May 31, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
KANAKE KAAIENAPUA, Defendant and Appellant.

**COUNSEL**

Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, Janice L. Feinstein and Aurelio Munoz, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Jack T. Kerry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HASTINGS, J.**—Kanake Kaaienapua was convicted by plea of possessing heroin (Health & Saf. Code, § 11350). Prior thereto he unsuccessfully brought a motion pursuant to Penal Code section 1538.5. He was sentenced to state prison and appeals contending: "I. Evidence obtained as a result of police eavesdropping from the vacant adjacent apartment should have been excluded as the fruit of an illegal search. II. Surreptitious police surveillance from the adjacent apartment violated appellant's right to privacy under article I, section 1 of the California Constitution."

■■ We view the evidence in the light most favorable to the order denying suppression as is required by the familiar rule governing appellate review. (*People* v. *James,* 19 Cal.3d 99, 107 [137 Cal.Rptr. 447, 561 P.2d 1135].) Narcotics officers from the Santa Monica Police Department received information from one Gene Carter, the manager of a boarding house at 1140 Seventh Street, that appellant was involved in narcotics activity in the room he rented therein. Specifically, Carter said that he had seen numerous people coming and going from appellant's room and that he had seen one girl there with her arm "tied off," and that he had smelled marijuana emanating from the room on numerous occasions.

The officers had previously arrested appellant for narcotics violations and were aware that he had numerous prior narcotics convictions. They went to the boarding house and, while standing in the street, saw appellant through the open window of his second story room. They contacted Mr. Carter and obtained permission to enter and occupy the room adjacent to appellant's room. Without the use of any type of mechanical or electronic equipment,[1] the officers, by placing their ears to the dividing wall, were able to overhear conversations and noises from which they concluded that narcotics activity was occuring inside appellant's room.[2] From outside appellant's front door, the officers were also able to smell the odor of marijuana emanating from within.

---

[1] The officers initially had attempted to use a stethoscope but were unable to understand any of the conversations emanating from within appellant's room, and so discarded it. We need not here decide whether or not the successful use of a stethoscope would be an impermissible method of gathering information since in this instance there was no fruit of its attempted use.

[2] The officers heard, inter alia, the following: "The stuff in this balloon isn't as good as the last stuff that I got here. . . . The other stuff was whiter. This stuff is more brown." They also heard loud sniffing and inhaling as well as conversation about "cocaine smuggling."

Two of appellant's companions opened the door to the room and appellant was observed standing inside. One of the officers knocked on the open door, and said, "Pete, you are under arrest, and I am coming in to take you into custody."[3] In plain sight, the officer observed a powdery substance in a spoon, a baggie of marijuana, and a small burnt marijuana cigarette warm to the touch.

After being advised that he was not required so to do, appellant nevertheless consented to a search of his room saying, "Sure, go ahead. I do not have any other drugs in here." Pursuant to the consent, three heroin-filled balloons were seized. Three similarly filled balloons were recovered from appellant's person during the booking process at the police station.

Appellant's first contention is without merit. "Reference to expectations of privacy as a Fourth Amendment touchstone received the endorsement of the Unites States Supreme Court in *Katz* v. *United States* (1968) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507]. Viewed in the light of *Katz,* the standard for determining what is an illegal search is whether defendant's 'reasonable expectation of privacy was violated by unreasonable governmental intrusion.' [Citations.]" (*People* v. *Triggs,* 8 Cal.3d 884, 891 [106 Cal.Rptr. 408, 506 P.2d 232].)

In *Lorenzana* v. *Superior Court,* 9 Cal.3d 626, 634 [108 Cal.Rptr. 585, 511 P.2d 33], our Supreme Court said, "[O]bservations of things in plain sight made from a place where a police officer has a right to be do not amount to a search in the constitutional sense. On the other hand, when observations are made from a position to which the officer has not been expressly or implicitly invited, the intrusion is unlawful unless executed pursuant to a warrant or one of the established exceptions to the warrant requirement."

The rule and rationale of *Lorenzana* is apposite to the situation here presented. Knowledge gained through an officer's use of his

---

[3]The officers and appellant were on a first name basis by virtue of their having previously arrested him.

auditory faculties from a place where he had a right to be does not amount to an impermissible intrusion in the constitutional sense.

■ In the instant case, the manager of a boarding house had requested the assistance of the police in dealing with the illegal activities he felt appellant, one of his tenants, was conducting within the premises. With the manager's express permission they entered into a vacant room wholly controlled by the manager and, consequently, were in a place where they had a right to be. (*United States* v. *Fisch,* 474 F.2d 1071, 1074.) As the court in *Fisch* determined, "Listening at the door to conversations in the next room is not a neighborly or nice thing to do. It is not genteel. But so conceding we do not forget that we are dealing here with the 'competitive enterprise of ferreting out crime.' . . . the officers were in a room open to anyone who might care to rent. They were under no duty to warn . . . appellants . . . to speak softly, to put them on notice that the officers were . . . listening." (*Id.,* at p. 1077.)

Equally apposite are our own observations in *People* v. *Guerra,* 21 Cal.App.3d 534, 538 [98 Cal.Rptr. 627]: "[I]f an individual desires that his speech remains private, he can easily assure himself of privacy by whispering, so that even a person in . . . [the officer's] position cannot hear him. Since it does seem established by respectable authority that speech which is loud enough to be understood by anyone outside is not protected, it would seem rather arbitrary to draw a constitutional line somewhere between the whisper and the shout."

We do not believe that either the California Constitutional provision protecting the right to privacy (Cal. Const. art. I, § 1) or the reasoning expressed in *White* v. *Davis,* 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222], give to criminals any greater right to privacy than that enjoyed by ordinary citizens who daily assume the risk that their neighbors may listen to their conversations through a common wall.

■ The written judgment purports to direct that defendant be "punished by imprisonment" in the California Institution for Men. The trial court does not have jurisdiction to specify detention in a particular institution. Since this is obviously a clerical error (see *People* v. *Mesa,* 14 Cal.3d 466, 471 [121 Cal.Rptr. 473, 535 P.2d 337]), the judgment is corrected to provide that defendant is sentenced to the state prison for

the term prescribed by law. (*People* v. *Thomas*, 65 Cal.App.3d 854, 858 [135 Cal.Rptr. 644].)

The judgment, as modified, is affirmed.

Kaus, P. J., and Stephens, J., concurred.

On June 29, 1977, the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied July 28, 1977.